## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | |
|---|---|
| REMETREX, INC., a Florida Corporation, ) | Case No. 15-cv-7161 |
| )  | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| BAXTER HEALTHCARE ) | |
| CORPORATION, a Delaware Corporation, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR (1) BREACH OF WRITTEN CONTRACT, (2) VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, (3) COPYRIGHT INFRINGEMENT, (4) INTENTIONAL MISREPRESENTATION; (5) NEGLIGENT MISREPRESENTATION, (6) UNJUST ENRICHMENT, AND (7) INJUNCTIVE RELIEF

Plaintiff Remetrex, Inc. ("Remetrex" or "Plaintiff") hereby alleges and complains against

defendant Baxter Healthcare, Inc. ("Baxter" or "Defendant") as follows:

### INTRODUCTION

1.      This is a case involving a multi-billion dollar healthcare company (Baxter) that

for years used and continues to use software designed and owned by a small software designer

(Remetrex), but refuses to pay for such use.

2.      Baxter did not always refuse to pay for the use of Remetrex's software.

3.      In 2002, Baxter and Remetrex's predecessor-in-interest (Brigham) entered into a

software license agreement for the use of Remetrex's software under which Baxter agreed to and

did pay license fees according to a set schedule.

4.      Beginning in 2008, however, Baxter informed Remetrex that it was winding up its

use of Remetrex software as it migrated its system to another software provider. Baxter

represented to Remetrex that during the migration it would require only limited use of

Remetrex's software for a reduced number of users. Based on this representation, Baxter

negotiated and Remetrex agreed to lower license fees for the wind-up period.

5.    After continuing to use the software for two more years (2008 and 2009) with an

allegedly reduced number of users, and paying lower license fees for this period, Baxter

informed Remetrex that it would no longer use Remetrex's software in any capacity after 2009.

As a result, Baxter discontinued payment of any further license fees after 2009.

6.    In 2015, a Baxter employee contacted Remetrex and revealed that, unbeknownst

to Remetrex, Baxter had secretly been using Remetrex's software since 2010.

7.    Remetrex further discovered through independent investigations that Baxter's

representations that it had first reduced its use of the licensed software in 2008 and 2009 and

then terminated its use of the software altogether after 2009 were false.

8.    Following this discovery, Remetrex demanded that Baxter pay license fees not

only for the past five years but also going forward for Baxter's continuing use of the software.

9.    Baxter acknowledged that it had continued using the software, but has refused to

pay for its unauthorized use.

10.    After unsuccessfully attempting to negotiate a resolution with Baxter, Remetrex

has no choice but to seek relief from this Court.

**PARTIES**

11.    Plaintiff Remetrex is a Florida corporation with its principal place of business in

Doylestown, Pennsylvania. Remetrex is the legal successor-in-interest to Brigham & Associates,

Inc. ("Brigham"), a Florida corporation, which dissolved effective September 15, 2006. Brigham

is the legal successor-in-interest to Brigham Consulting, Inc., a Florida corporation, which also

dissolved effective September 15, 2006.

12. Defendant Baxter is a Delaware corporation, with its principal place of business in Deerfield, Illinois.

## VENUE AND JURISDICTION

13. The United States District Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy herein exceeds $75,000 and because this action is between citizens of different states. More specifically, Plaintiff is a citizen of Florida, where it is incorporated, and Pennsylvania, where it has its principal place of business. Defendant is a citizen of Delaware, where it is incorporated, and Illinois, where it has its principal place of business.

14. The District Court also has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that at least one of the claims asserted in this action is based on a federal question, namely whether there has been an infringement of copyright protection afforded to Plaintiff under federal laws.

15. Venue is appropriate in this district under 28 U.S.C. §§ 1391(b) and (c) and § 1400(a) in that Defendant resides in this district.

## GENERAL ALLEGATIONS

16. Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

### *Remetrex*

17. Remetrex is a privately held corporation that provides quality solutions to companies operating in the pharmaceutical, biotechnological and medical device and services industry throughout the United States and worldwide.

18.     Remetrex previously operated under the name of its predecessor-in-interest, Brigham. Brigham transferred all of its assets, including but not limited to all of its intellectual property, to Remetrex under the terms of an asset transfer agreement, dated June 30, 2004, signed by James G. (Greg) Brigham, President of both Brigham and Remetrex.

19.     In connection with its business, Remetrex provides companies with software and consulting services that are specifically tailored to meet each customer's needs, including complaint-handling for customers, corrective and preventive action management, compliance and reporting with respect to various regulatory and government entities, nonconformance management, auditing and other regulatory needs.

20.     In connection with its business, Remetrex (and its predecessor Brigham) designs and develops multiple software products for use by its customers.

21.     Remetrex retains ownership of all software that it develops, and licenses its software to its customers on a case-by-case basis.

### *Master Software License Agreement*

22.     On or about August 27, 2002, Remetrex's predecessor-in-interest, Brigham, entered into a Master Software License Agreement (the "License Agreement") with Baxter, effective August 21, 2002. A true and correct copy of the License Agreement is attached hereto as Exhibit A.

23.     Under the terms of the License Agreement, Brigham licensed to Baxter the right to use certain computer software owned by Brigham, as well as related documentation and materials.

24.     The base software licensed to Baxter under the License Agreement is known as New Atlas Product Quality Management System (PQMS) software, which was then customized to Baxter's specific intended use.

25.     The particulars of the software licensed to Baxter under the License Agreement, including the name (New Atlas PQ) and the payment terms are set forth on Schedule A, executed by Baxter on August 26, 2002, and by Brigham on August 29, 2002. Schedule A is incorporated into and is a part of the License Agreement.

26.     Under the terms of the License Agreement and Schedule A, Brigham delivered the New Atlas PQMS software to Baxter in or about late August, 2002, and Baxter "accepted" the software (as defined under Schedule A) shortly thereafter. Both parties were legally bound by the terms of the License Agreement and Schedule A as of the date of "acceptance" by Baxter. Following such "acceptance" by Baxter, it became obligated to pay the license fee owed under the License Agreement for so long as the agreement was in effect.

27.     At all times the New Atlas PQMS software, a customized version of which was licensed to Baxter under the License Agreement (colloquially referred to by Baxter as QDS, for "Quality Director System") (hereinafter sometimes referred to as QDS), was owned (and is owned) by Remetrex or its predecessor(s)-in-interest.

28.     The New Atlas PQMS base software, which was then customized into the QDS software, is copyrighted and registered with the United States Copyright Office. A Certificate of Registration was issued by the United States Copyright Office on August 9, 2002 and is identified as Registration No. TXu001064667.

29.     The license term under the License Agreement is defined as one year and a specific fee schedule is set forth on Schedule A, including a one-time license fee of $150,000

plus additional "Sequence license fees" based on the number of Baxter Sequences that would be used by Baxter. A sequence is defined under Schedule A as a unique numbering system used by distinct Baxter lines of business.

30.     Under Schedule A to the License Agreement, the initial Sequence license fees required to be paid by Baxter to Remetrex (or its predecessor, Brigham) were $37,500 per annum, based on the use of the licensed software for four Baxter Sequences used by four Baxter lines of business, including those known as "Renal," "Fenwal," "MD" and "Bio-Science."

31.     Schedule A also provides that unless Schedule A has been terminated on the anniversary date of the date on which Baxter first accepts the Remetrex software in accordance with the acceptance procedures set forth under Schedule A, Baxter shall pay annual license fees in accordance with the license fee schedule set forth therein for a period of five years. After five years, annual license fees in accordance with Licensor's (Remetrex) then current license fee schedule are to be paid.

32.     As discussed above, Brigham transferred all of its legal rights and interests in its property, including its rights under the License Agreement and ownership of the copyright registration on its New Atlas PQMS base software, to Remetrex on June 30, 2004.

33.     Remetrex is the current owner of the copyright registration on the New Atlas PQMS base software.

### Baxter's Use of the Licensed Software From 2002 through 2009

34.     Between the effective date of the License Agreement, August 21, 2002, and the end of 2006, Baxter used the New Atlas PQMS software (as customized for Baxter) and paid license fees to Remetrex. Specifically, Baxter paid Remetrex (or Brigham) the initial license fee of $150,000 plus Sequence license fees of $37,500 per annum during this period.

35.     On or about January 17, 2007, Remetrex, through its president, Greg Brigham, sent an email to one of his primary contacts at Baxter, Devra Budzik, whose then title was Director, Quality Systems, Global IT R&D/RA/QA Portfolio. In his email, Mr. Brigham asked whether he should send Baxter an invoice for calendar year 2007 for the continued use of the QDS software.

36.     By its terms the License Agreement (incorporating Schedule A) renews automatically and renewal license fees are due on the "acceptance" anniversary date unless the License Agreement has been terminated. Thus, while not required to ask Baxter whether it wished to renew the license, as it renewed automatically under its own terms, Mr. Brigham extended Baxter the courtesy of asking it whether it wanted to renew the license prior to sending it an invoice for 2007.

37.     In an email response, also dated January 17, 2007, Ms. Budzik said "yes," and explained that while Baxter intended to migrate to a different software platform later in 2007, Baxter would need to continue using the QDS software in 2007, and therefore, Remetrex should invoice Baxter accordingly.

38.     Remetrex subsequently sent Baxter an invoice in January, 2007, and while it took several months, Baxter eventually paid this invoice.

39.     On January 29, 2008, Mr. Brigham sent Ms. Budzik an email requesting confirmation that Baxter had discontinued its use of the QDS software and had uninstalled the application and removed the corresponding database from Baxter's computers.

40.     Ms. Budzik responded by email the same day stating that Mr. Brigham would be hearing back from Bill Hoffman, another Baxter employee, whose title at the time was Director, IT, GIT Compliance & Product Lifecycle ARO.

7

41.     On March 17, 2008 Mr. Hoffman told Mr. Brigham during a telephone call that Baxter was still using the QDS software at the time, because Baxter still was in the process of migrating its systems to another software platform, and that Baxter needed to continue using the QDS software, but for a more limited number of users and for the limited purpose of migrating to new software.

42.     During the March 17, 2008 telephone call, Mr. Hoffman further requested that Remetrex lower the license fee based on Baxter's allegedly more limited use of the licensed software.

43.     The final details of a revised license fee structure were not resolved during this March 17, 2008 telephone call but Mr. Brigham and Mr. Hoffman agreed to continue discussions until they were able to determine with more detail the extent to which Baxter was continuing to use the QDS software.

44.     On April 10, 2008, Mr. Brigham sent Mr. Hoffman an email stating that he had spoken to another Baxter employee, John Message, who "confirmed" that Baxter was continuing to use the Remetrex software, but that only "about 15" Baxter employees were using the software for the limited purpose of reporting while Baxter migrated to another software platform.

45.     Based on Mr. Message's representation, Mr. Brigham proposed a 2-year license extension with a license fee of $15,000 per year, with the condition that Baxter would use the software for the limited purpose of assisting in its migration to another platform and that no more than 15 Baxter users would use the software.

46.     Mr. Hoffman responded in an email dated April 16, 2008, and stated that Mr. Brigham should work out the details of a license extension with Justin Southwell, a sourcing manager for Baxter.

8

47.     Based on negotiations between Mr. Brigham and Mr. Southwell, the parties agreed to a one-year license extension with a license fee of $15,000 and a restriction that the software be used by no more than 15 Baxter users in order to facilitate Baxter's migration of its system to another software platform.

48.     Remetrex invoiced Baxter for the $15,000 license fee in May, 2008. The invoice was paid by Baxter in December, 2008.

49.     On September 21, 2009, C. Yvonne Tompkins, a Senior Manager at Baxter, informed Mr. Brigham that Baxter was still using Remetrex software and as such that it would need to again renew its license for calendar year 2009, but that its use would be even more limited to just 10 users.

50.     In response to Ms. Tompkins' request for a quote for a license fee for 2009 based on the more limited use of the software (i.e. only 10 users), Mr. Brigham sent Ms. Tompkins a quote for a license renewal for 10 users for a license fee of $10,000 for January 2009 through December 2009.  Baxter accepted these terms and renewed its license for the year 2009. Baxter subsequently paid Remetrex $10,000 for this renewal, although payment was not made until January, 2010.

51.     Following the 2009 license renewal and payment, Remetrex understood the License Agreement to be terminated by Baxter based on Baxter's prior representations that the License Agreement was terminated, that Baxter had completed the process of migrating its systems over to another platform, and that Baxter would not be using Remetrex software in any capacity whatsoever after 2009.

52.     Remetrex confirmed its understanding that the License Agreement had been terminated in at least one telephone call between Mr. Brigham and a Baxter employee sometime

after October 15, 2009. Baxter further confirmed that it did not wish to renew the License Agreement or to continue using Remetrex software after 2009 by failing to contact Remetrex and to arrange for any further renewals after 2009.

53.     Based on its understanding that the License Agreement was terminated and that Baxter was no longer using Remetrex software after 2009, Remetrex did not send any invoices to Baxter for license fees, nor did Remetrex receive any further payment from Baxter, after Baxter made its final payment in January 2010 (for 2009 license fees). In short, Remetrex understood that the business relationship between Baxter and Remetrex was terminated, effective January 1, 2010.

### Baxter's Surreptitious Use of Remetrex Software After 2009

54.     On January 28, 2015, after five years of having no contact with Baxter, Greg Brigham received an email from Victoria Lando, in the Global Purchasing and Supplier Management department of Baxter, asking to set up a telephone call to discuss "contract disposition" with Remetrex.

55.     Ms. Lando further explained in the same email that Baxter had announced plans to split the company into two publicly traded companies separately centered around Baxter's medical products and its bioscience lines of business. Ms. Lando and Mr. Brigham subsequently set up a telephone call for January 30, 2015.

56.     On January 30, 2015, Ms. Lando and Mr. Brigham spoke by telephone. During that call Ms. Lando reiterated Baxter's plans to divide into two separate companies, stated that Baxter considered Remetrex to be one of its key vendors and that it would like to continue the business relationship with Remetrex going forward, but also that it wanted to ensure that it would

10

only be paying Remetrex a single license fee going forward and not treat the contract as if was

two separate contracts for two separate businesses.

57.     Prior to the January 30, 2015 telephone call, Remetrex believed that Baxter had

discontinued its use of the Remetrex software at the end of 2009. As such, Mr. Brigham was

surprised to learn that Baxter was still using the software and that both of the newly spun off

Baxter entities intended to use Remetrex software going forward.

58.     Baxter did not pay Remetrex to use the Remetrex software after 2009.

59.     Following their telephone conversation on January 30, 2015, Ms. Lando sent an

email to Mr. Brigham with an attached draft "Amendment to Software Agreement," which

purported to extend the term of the License Agreement until November 1, 2018, and made it

clear that the agreement authorized any Baxter affiliate or spin-off company to use the Remetrex

software under the License Agreement.

60.     While this draft "Amendment to Software Agreement" was never signed, it

reflected Baxter's position that the License Agreement was still in effect.

61.     Following his January 30, 2015 telephone call with Ms. Lando, and his review of

the draft Amendment to Software Agreement, Mr. Brigham undertook an independent

investigation and learned that Baxter had been using the QDS software all along and that it was

continuing to use the software, contrary to Baxter's earlier representations.

62.     Moreover, Mr. Brigham learned that Baxter was not limiting its use of the

Remetrex software to assisting with the migration to a new software platform (which certainly

would not have taken seven years in any event) as Baxter had represented that it was doing in

2008 and 2009. To the contrary, during this five-plus year period (January 2010 through the end

of January 2015), Baxter had been making far greater use of the QDS software and its corresponding database than it had represented to Remetrex.

### *Remetrex Demand for Payment of License Fees; Subsequent Negotiations*

63.     As a result of Mr. Brigham's discovery that Baxter had been using Remetrex software on an ongoing basis, and had never terminated its use as it had misrepresented to Remetrex in the past, Mr. Brigham sent an email to Ms. Lando, dated February 9, 2015, in which he stated that it had come to Remetrex's attention that Baxter was still using Remetrex software, and had been all along. As a result, Mr. Brigham stated, Baxter owed Remetrex license fees for its use of the software. Attached to this email was an invoice showing an outstanding balance of unpaid license fees (plus interest) of $408,015.00.

64.     On the same day, February 9, 2015, Ms. Lando responded by email to Mr. Brigham in which she asked him how it came to his attention that Remetrex software was still being used by Baxter and asking for an explanation as to the past-due fees that were itemized in the invoice previously sent by Mr. Brigham.

65.     Mr. Brigham sent an email back the same day stating that his first insight into Baxter's continued use of Remetrex software came from Ms. Lando when she contacted him and indicated that the product was still being used by Baxter. Mr. Brigham also stated that Remetrex had verified independently that Baxter was still using the software, though he did not explain how Remetrex had verified this.

66.     In subsequent email exchanges over the next few weeks, Baxter, and specifically Ms. Lando, asked for more information and documents pertaining to License Agreement, how license fees were calculated and past communications between Remetrex and Baxter concerning Baxter's use of the software.

67.     Although not required to do so, Mr. Brigham willingly provided this information to Ms. Lando, including a copy of the License Agreement and an explanation of how the fees were calculated.

68.     On February 24, 2015, at Ms. Lando's request, Mr. Brigham participated in a telephone call with Ms. Lando and Jose Rivas, also of Baxter, to further discuss the License Agreement and background on past communications between Remetrex and Baxter concerning Baxter's use of the software and its alleged migration off of the software onto a different platform.

69.     On February 24, 2015, at the request of Ms. Lando and Mr. Rivas, Mr. Brigham sent them an email listing the names of Baxter employees with whom Mr. Brigham had communicated in the past about Baxter's use of the Remetrex software, Baxter's alleged migration to a different platform, and negotiations regarding reduced license fees in 2008 and 2009 based on Baxter's alleged limited use of the software. Specifically, Mr. Brigham listed the names Yvonne Tompkins, Bill Hoffman, and Justin Southwell. Mr. Brigham also requested a follow-up telephone call for March 3, 2015.

70.     Ms. Lando canceled the March 3, 2015 telephone call but, in subsequent emails, she continued to ask for additional information regarding the calculation of license fees, past communications between Remetrex and Baxter and how Remetrex was able to determine that Baxter continued using the Remetrex software.

71.     Mr. Brigham continued to cooperate with Ms. Lando and continued to provide more and more information as it was requested in February and March, 2015.

72.     Finally, another call was arranged and took place on March 20, 2015. Mr. Lando and Justin Southwell attended the call, on behalf of Baxter, and Mr. Brigham and Dave Kurek attended on behalf of Remetrex.

73.     During this call, Mr. Southwell admitted that Baxter was continuing to use Remetrex's software for historical audits but also said that he did not believe Baxter should have to pay the full license fees agreed to under the License Agreement and requested that Remetrex reduce the license fee rate.

74.     Mr. Brigham said that Remetrex would not reduce the amount of the license fees and expressed his displeasure with having been deceived by Baxter for years as to the latter's continued use of Remetrex software when Baxter had expressly stated that it was no longer using it after 2009.

75.     No resolution was reached during this telephone call as to whether Baxter would be paying past-due license fees as well as fees going forward.

76.     Mr. Southwell stated at the end of the call that he would send a proposal to Remetrex after the call, but Remetrex has not received any such proposal.

77.     On April 1, 2015, Mr. Brigham sent an email to Ms. Lando and Mr. Southwell asking if Baxter had any further response to the apparently stalled discussions between the parties about Baxter's continued use of Remetrex software and its obligation to pay past-due and current license fees.

78.     Mr. Brigham did not receive a response to this email and Remetrex has received no communication whatsoever from Baxter following the March 20, 2015 telephone call.

79.     Based on information and belief, Baxter continues to use Remetrex software presently.

14

80. Baxter has never made any payment to Remetrex after January, 2010 for the use of Remetrex software, and has not agreed to make payment for Baxter's use of such software after December 31, 2009.

## COUNT I
## Breach of Written Contract

81. Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

82. Baxter and Brigham (Remetrex's predecessor-in-interest) entered into the License Agreement on or about August 27, 2002. Baxter "accepted" the QDS software shortly thereafter and therefore became bound by the terms of the License Agreement, including the obligation to pay the license fee set forth in Schedule A for so long as the License Agreement was in effect.

83. Under Schedule A (which is incorporated into and is a part of the License Agreement), Baxter is required to pay an annual Renewal License Fee each year in which the License Agreement is in effect, according to Licensor's then current license fee schedule. The renewal license fee is due and payable on the Acceptance anniversary date (meaning the anniversary date of the date the QDS software was first accepted, or shortly after August 27 of each calendar year).

84. Section 6.1 of the License Agreement provides the method of termination of the License Agreement by Baxter. Specifically, that section provides that Baxter may terminate the License Agreement upon providing thirty days written notice to licensor (Remetrex).

85. Baxter failed to ever provide Remetrex with thirty days written notice that it was terminating the License Agreement.

86. As such, the License Agreement was never terminated and remains in full force in effect.

15

87.     In the event Baxter contends it, in effect, gave notice it was terminating the License Agreement by way of multiple emails and telephone conversations in 2009 that it would discontinue use of the QDS software after completing its migration to a new platform in 2009, and that Remetrex accepted this as notice of termination of the License Agreement by not insisting on formal written notice of termination and by no longer attempting to collect license fees after 2009, Remetrex states as follows: Remetrex was unaware that Baxter had continued to use the QDS software after 2009 and hence, Remetrex could not have knowingly agreed to and accepted Baxter's termination of the License Agreement or waived the requirement of formal written notice of termination. As such, the License Agreement remained in full force and effect after 2009.

88.     Baxter breached the terms of the License Agreement by, among other things, failing to pay the renewal license fee each year after 2009 in which Baxter continued using the Remetrex software.

89.     To the extent the License Agreement was terminated, Baxter breached the agreement by failing to discontinue usage of the licensed software and return to Remetrex or destroy all user-accessible copies of the software and certify in writing as to its return or destruction, in accordance with Section 6.1 of the License Agreement.

90.     Remetrex fully performed its obligations under the License Agreement by, among other things, making the licensed software fully available to Baxter and providing any and all support services necessary for Baxter to use the software for the entire time in which the License Agreement was (and continues to be) in effect. To the extent that Remetrex did not perform any obligations it was required to perform under the License Agreement such obligations were fully

16

excused by Baxter's breach of the License Agreement and, in particular, by Baxter's continued use of the software for years after informing Remetrex that it was no longer using the software.

91.     As a direct and proximate cause of Baxter's breach of the License Agreement, Remetrex has suffered actual damages in the form of lost license fees that were owed by Baxter, as well as significant attorneys' fees and costs that Remetrex has incurred in its attempt to enforce its rights under the License Agreement.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## Count II
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act)

92.     Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

93.     Beginning in 2007 and continuing in 2008 and 2009, Baxter, through various employees, made numerous representations to Remetrex that Baxter would be migrating off of the Remetrex licensed software and onto another platform. Baxter further represented that after the migration was complete, Baxter would no longer use the Remetrex licensed software.

94.     In January, 2007, Baxter represented to Remetrex that it would complete its migration onto a different platform and, hence, would no longer use Remetrex software after November, 2007.

95.     When Remetrex contacted Baxter in January, 2008 to confirm that Baxter was no longer using Remetrex software, Baxter informed Remetrex that it was still using the software but on a more limited basis as the migration to a different platform was ongoing.

96.     Relying on Baxter's representations that it [Baxter] was using the Remetrex software only to assist Baxter with the migration and that it would limit access to the software to

17

15 and 10 of its users in years 2008 and 2009, respectively, Remetrex negotiated reduced license fees of $15,000 and $10,000 for years 2008 and 2009, respectively, rather than full license fees for these years, which would have been $37,500 per year.

97.     Baxter informed Remetrex that it would be done with its migration in 2009 and that it would no longer be using the Remetrex software after 2009. Moreover, Baxter did not seek any further extensions on the License Agreement after 2009.

98.     In reliance on this representation, Remetrex did not charge Baxter any license fees, nor did Baxter pay any license fees, for any period after 2009.

99.     As it turns out, Baxter's representations to Remetrex about discontinuing its use of Remetrex software were false.

100.     Baxter continued using the QDS software after 2009 and has been using it on an ongoing basis ever since, while representing to Remetrex that it had discontinued its use of such software.

101.     For the period from January 1, 2010 through the present, Baxter paid no license fees to Remetrex for the use of the QDS software.

102.     Baxter also did not limit its use the QDS software in 2008 and 2009 to only assisting Baxter with its migration to a new software platform, as it represented it would, and instead, Baxter made full use of the QDS software during these years, including using it for regulatory compliance, reporting and responding to audits.

103.     Further, Baxter did not limit the use of the QDS software to 15 users and 10 users in 2008 and 2009, respectively, but rather, upon information and belief, many more Baxter employees used the software during these years, as they made full use of the software.

18

104.     Baxter provided false information to Remetrex about its use of the software first to significantly reduce the amount of license fees it was required to pay for 2008 and 2009, and then to eliminate entirely its payment of license fees after 2009.

105.     Further, Baxter misrepresented and concealed the extent to which it used the Remetrex software in years 2008 and 2009 as well as for the period since then. In making these false representations, and in deceiving Remetrex and concealing information from Remetrex, Baxter intended that Remetrex rely on the concealment and omission in first agreeing to reduce the license fees and then eliminating license fees after 2009.

106.     Baxter's behavior, and specifically its misrepresentations about its use of the QDS software, constitutes "unfair or deceptive acts or practices" under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.,  which includes "use or employment of any deception fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, . . ."

107.     Pursuant to 815 ILCS 505/10a(a), Remetrex is entitled to an award of its actual damages in the form of the underpaid and unpaid license fees, or the equivalent value thereof, plus interest, plus exemplary and/or punitive damages, as the Court deems proper.

108.      Pursuant to 815 ILCS 505/10a(b), Remetrex also is entitled to its reasonable attorneys' fees and costs in pursuing this action.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## COUNT III
### (Copyright Infringement)

109.     Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

110.     This is further an action for copyright infringement, pursuant to the U.S. Copyright Act, 17 U.S.C. § 101 et seq.

111.     Remetrex, or its predecessors-in-interest, has been the owner of a valid copyright in the base software known as New Atlas PQMS software since 2002, when its predecessor (Brigham) developed the software. The United States Copyright Office issued a Certificate of Registration, No. TXu001064667 on August 9, 2002.

112.     Brigham agreed to license a customized version of the New Atlas PQMS software to Baxter under the License Agreement. The version of the software license to Baxter under the License Agreement – known as New Atlas PQ or QDS -- was customized to meet Baxter's specifications but comprises the core software in which Remetrex has a registered copyright.

113.     Prior to January, 2010, Baxter used Remetrex's software as authorized under the License Agreement and paid license fees to Remetrex (or its predecessor, Brigham) for the use of the QDS software.

114.     In or about 2009, Baxter provided Remetrex with notice of its intent to terminate the License Agreement effective as of December 31, 2009, and also stated its intent to discontinue using the QDS software in any capacity after 2009.

115.     To the extent that the License Agreement was terminated, effective December 31, 2009, Baxter no longer had a license to use or copy Remetrex's copyrighted QDS software.

20

116.    Since January 1, 2010 through the present, Baxter and /or its successor(s) or affiliate(s), has copied the QDS software on its computer systems and continued to use the QDS software without any license fees for such copying and use.

117.    Baxter, and /or its successor(s) or affiliate(s) is currently using the QDS software without a license for such use.

118.    Baxter has infringed upon Remetrex's registered copyright in the New Atlas PQMS software by, among other things: (i) exceeding the scope of its agreed-upon limited use license for such software in 2008 and 2009 by (a) having more users than 15 users and 10 users, respectively, use such software during those years, and (b) by using the software in its full capacity rather than limiting its use to assisting Baxter with the migration of its system to a different software platform during those years; and (ii) continuing to use the software since January 1, 2010, without Remetrex's knowledge or consent, after the termination of the License Agreement, and without paying any license fees to Remetrex for such use.

119.    Upon information and belief Baxter's infringement of Remetrex's registered copyright, as described above, was intentional and willful.

120.    As a result of Baxter's infringement of Remetrex's registered copyright, Remetrex has suffered actual damages in the form of lost license fees, in an amount to be proved at trial.

121.    Pursuant to 17 U.S.C. § 504(b), Remetrex is entitled to recover its actual damages resulting from Baxter's infringement of Remetrex's registered copyright in the Remetrex software, as well as any profits enjoyed by Baxter that are directly attributable to the infringement.

122.    In the alternative, pursuant to 17 U.S.C. § 504(c), Remetrex is entitled to statutory damages for the infringement of its registered copyright.

21

123.     Pursuant to 17 U.S.C. § 505, Remetrex is also entitled to its reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## COUNT IV
### (Intentional Misrepresentation)

124.     Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

125.     In 2008 and 2009 Baxter repeatedly stated to Remetrex verbally and in writing that Baxter would be discontinuing its use of the QDS software and that it only needed to use such software during 2008 and 2009 on a limited basis, i.e., for a reduced number of users (15 users in 2008 and 10 users in 2009), and for the limited purpose of assisting Baxter with the migration of its system to another software platform.

126.     In 2009, Baxter repeatedly stated to Remetrex verbally and in writing that Baxter would discontinue its use of the QDS software after 2009, and therefore, no further extensions to the License Agreement would be necessary.

127.     Baxter discontinued paying license fees to Remetrex after 2009.

128.     In 2010, on at least one occasion, Baxter informed Remetrex that it had indeed discontinued its use entirely of the QDS software.

129.     The statements made by Baxter regarding its reduced and limited use of the QDS software in 2008 and 2009 were false in that Baxter intended at the time it made such statements to continue to use the QDS software on the full-scale basis for which it originally was intended to be used, including but not limited to regulatory reporting and compliance with audits.

22

130.    The statements made by Baxter regarding its planned and actual discontinued use of the QDS software after 2009 were false in that Baxter did not intend to discontinue fully its use of the QDS software when it said it was in the process of migrating to another software platform.

131.    The statements made by Baxter that it had completely discontinued its use of the QDS software in 2010 and thereafter were false.

132.    The false statements that Baxter made about its planned and actual discontinuance of its use of the QDS software were material in that they directly resulted in drastically reduced license fee payments to Remetrex for 2008 and 2009 and it resulted in the cessation of license fee payments altogether after 2009 when Baxter had allegedly discontinued its use of the software entirely.

133.    The false statements had a direct impact on Remetrex in the form of hundreds of thousands of unpaid license fees.

134.    Baxter knew at the time of its statements about its reduced use of the Remetrex software in 2008 and 2009 and its discontinued use of such software after 2009 that such statements were false.

135.    Baxter intended at the time it made these false statements that Remetrex would rely on the truth of such statements first to agree to reduce license fee payments in 2008 and 2009 and then to agree to end such license fee payments after 2009.

136.    Remetrex was unaware of the falsity of Baxter's false statements when they were made.

137.     Remetrex reasonably and justifiably relied on the truth of Baxter's statements when it agreed to reduce license fee payments in 2008 and 2009, based on Baxter's allegedly reduced use of the Remetrex software.

138.     Remetrex reasonably and justifiably relied on Baxter's statements that it had completely discontinued use of the software after 2009, when Baxter discontinued making license fee payments and Remetrex took no steps to attempt to collect such payments.

139.     As a direct result of its reliance on the false statements made by Baxter, Remetrex suffered damages in that it agreed to accept reduced license fee payments in 2008 and 2009 and it received no license fees after 2009 when Remetrex clearly had a legal and/or contractual right to receive full license fee payments under the License Agreement and otherwise.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## COUNT V
### (Negligent Misrepresentation)

140.     Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

141.     To the extent that the false statements Baxter made about its reduced use of the QDS software in 2008 and 2009, and its discontinued use of such software after 2009, were not made intentionally by Baxter with the intent to deceive Remetrex, such statements were made carelessly and negligently and without regard for their truth.

142.     Further, Baxter was negligent after making such statements in failing to follow up internally to determine whether in fact Baxter had reduced its use of the QDS software in 2008 and 2009, as Baxter had said it would, and whether in fact Baxter had in fact discontinued its use of such software after 2009.

24

143. Baxter was unaware at the time that it was making false statements about its reduced use of the QDS software in 2008 and 2009 and its discontinued use of such software after 2009, whether such statements were true or false.

144. Baxter intended at the time it made these false statements that Remetrex would rely on the truth of such statements first to agree to reduce license fee payments in 2008 and 2009 and then to agree to end such license fee payments after 2009.

145. Remetrex was unaware of the falsity of Baxter's false statements when they were made.

146. Remetrex reasonably and justifiably relied on the truth of Baxter's statements when it agreed to reduce license fee payments in 2008 and 2009, based on Baxter's allegedly reduced use of the QDS software.

147. Remetrex reasonably and justifiably relied on Baxter's statements that it had completely discontinued use of the software after 2009, when Baxter discontinued making license fee payments and Remetrex took no steps to attempt to collect such payments.

148. As a direct result of its reliance on the false statements made by Baxter, Remetrex suffered damages in that it agreed to accept reduced license fee payments in 2008 and 2009 and it received no license fees after 2009 when Remetrex clearly had a legal and/or contractual right to receive full license fee payments under the License Agreement and otherwise WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## COUNT VI
### (Unjust Enrichment)

149. Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

150.     Baxter enjoyed full use of the QDS software in years 2008 and 2009, which far exceeded the limited use in both scope and number of authorized users (15 in 2008 and 10 in 2009) that Baxter and Remetrex had agreed to for those years. Yet Baxter paid only a portion of the license fees it would have owed under the License Agreement had the agreement been in effect.

151.     As a result of Baxter exceeding the limited scope of use of the QDS software during years 2008 and 2009, to which Baxter had agreed, Baxter unjustly enjoyed benefits (the use of the software) for which it did not fully pay, to the detriment of Remetrex, which received lower license fees.

152.     Baxter enjoyed full use of the QDS software after 2009, and continues to enjoy full use of such software in the present, without paying any license fees whatsoever for the use of such software. As a result, Baxter has unjustly enjoyed benefits (the full use of the software) for which it paid nothing during this period, to the detriment of Remetrex, which received no license fees after 2009.

153.     Baxter's retention of the benefits described herein, without paying for such benefits, to the detriment of Remetrex, violates fundamental principles of justice, equity and good conscience.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## COUNT VII
### (Injunctive Relief)

154.     Plaintiff incorporates herein by reference the allegations contained in each of the paragraphs above, inclusive, as though fully set forth herein.

155.     Remetrex is the owner of the New Atlas PQMS software and all renditions of it, including the QDS software licensed to Baxter under the License Agreement. As such, Remetrex

has a right to protection of its ownership interest in such software, including the unauthorized use of such software in violation of Remetrex's copyright and ownership interest, without compensation to Remetrex.

156. Unless enjoined by this Court, the conduct of Baxter in using the QDS software without compensating Remetrex for such use will continue to cause Remetrex great and irreparable injury that cannot be fully compensated with monetary damages. More specifically, if Baxter is not enjoined from using the QDS software without Remetrex's consent, the effect will be to force Remetrex to license its property against its will. Remetrex will lose control over its own property. Money alone cannot make up for the loss Remetrex will incur in losing custody and control over its property without its consent.

157. Remetrex has no adequate remedy in law to address the continued use of Remetrex's software without Remetrex's permission.

158. Pursuant to 17 U.S.C. §§ 502 and 503, Remetrex is entitled to injunctive relief prohibiting Baxter from further use of the QDS software, or any rendition of it, and ordering Baxter, or any of its affiliates, to return to Remetrex or destroy all copies of such software currently in Baxter's (or any of its affiliates') possession.

WHEREFORE, Plaintiff prays for judgment against Defendant Baxter as hereinafter set forth.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.      For actual damages, in an amount subject to proof at trial, but not less than $408,015.00 for unpaid license fees on the first through sixth claims for relief.

2.      For pre-judgment and post-judgment interest on any award of actual damages as permitted under Illinois law.

3.      In the alternative, for statutory damages as determined by the Court on the third claim for relief.

4.      For exemplary and/or punitive damages deemed appropriate by the Court under the second through fifth claims for relief.

5.      For reasonable attorneys' fees and costs under the first through third claims for relief.

6.      For such other and further relief as the Court may deem just and proper.


DATED: August 14, 2015                ARNSTEN & LEHR, LLP

                                      By:   /s/ Joseph M. Kuo
                                            Joseph M. Kuo
                                            George P. Apostolides
                                            ARNSTEIN & LEHR LLP
                                            120 S. Riverside Plaza, Suite 1200
                                            Chicago, Illinois 60606
                                            Tel: (312) 876-7100

                                            Email: jmkuo@arnstein.com
                                                   gpapostolides@arnstein.com

                                            Attorneys for Plaintiff , Remetrex, Inc.

28